# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| AEY, Inc. | ) | ASBCA Nos. 56470, 56471, 56472 |
| | ) | 56473, 56591 |
| Under Contract Nos. W91GY0-07-M-0815 | ) | |
| W91GY0-07-M-0670 | ) | |
| W91GY0-08-M-0010 | ) | |
| W91GY0-08-C-0005 | ) | |
| W91GY0-08-M-0040 | ) | |

APPEARANCES FOR THE APPELLANT:      Jeff H. Eckland, Esq.
                                    Jared M. Reams, Esq.
                                      Eckland & Blando LLP
                                      Minneapolis, MN

APPEARANCES FOR THE GOVERNMENT:     Raymond M. Saunders, Esq.
                                      Army Chief Trial Attorney
                                    MAJ Jason W. Allen, JA
                                      Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE O'SULLIVAN

AEY, Inc. (AEY) appeals from contracting officers' final decisions terminating a total of five contracts for cause, either partially or in full. The contracts were awarded by the Joint Contracting Command—Iraq (JCCI) in 2007 for arms and accessories for the Multi-National Security Transition Command in Iraq (MNSTC-I), ultimately destined for the use of the Security Forces of Iraq. We have jurisdiction under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. In large part, we sustain the appeals.

## FINDINGS OF FACT

1. In chronological order of award, the five contracts at issue are: (1) Contract No. W91GYO-07-M-0670 (M-0670), awarded 29 July 2007 for a total amount of $4,645,785.84 (R4, tab 1); (2) Contract No. W91GYO-07-M-0815 (M-0815), awarded 27 September 2007 for a total amount of $2,874,500.00 (R4, tab 3); (3) Contract No. W91GYO-08-M-0010 (M-0010), awarded 4 December 2007 for a total amount of $1,180,144.44 (R4, tab 24); (4) Contract No. W91GYO-08-C-0005 (C-0005), awarded 8 December 2007 for a total amount of $12,331,700.00 (R4, tab 5); and (5) Contract No. W91GYO-08-M-0040 (M-0040), awarded 17 December 2007 for a total amount of $1,192,915.60 (R4, tab 8).

2. Delivery for each contract line item number (CLIN) under these contracts was due no later than a specified number of days (usually 45 or 60) following AEY's receipt of the end user certificate (EUC)[1] for the item from JCCI (R4, tab 3 at 7, tab 5 at 2, tab 8 at 7, tab 24 at 5). The contracts required AEY to request an EUC from JCCI for each line item within three days of "receipt of order," which AEY interpreted to mean its supplier's receipt of AEY's order for the item, since the submitted EUC request had to identify the supplier (tr. 1/70-71).[2] The intended end users were the Security Forces of Iraq, under the Ministry of the Interior, the Ministry of Foreign Affairs, or the Ministry of Defense. Officials from one of these organizations would typically sign the EUC before delivering it back to JCCI for delivery to AEY. (Tr. 1/62-63) Delivery dates for each contract could and did vary by CLIN, depending on when AEY received an acceptable EUC for each item.

3. Each of the five contracts contained the Federal Acquisition Regulation (FAR) 52.232-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS clause. Contracts M-0670, M-0815, M-0040, and M-0010 contained the FEB 2007 version of the clause. Contract C-0005 contained the FEB 2005 version of the clause. The following provisions of the clause are relevant to these appeals, and text appearing only in the FEB 2007 version is bracketed:

> (a) Inspection/Acceptance. The Contractor shall only tender for acceptance those items that conform to the requirements of this contract. The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance. The Government may require repair or replacement of nonconforming supplies...at no increase in contract price. [If repair/replacement...will not correct the defects or is not possible, the Government may seek an equitable price reduction or adequate consideration for acceptance of nonconforming supplies or services.] The Government must exercise its postacceptance [sic] rights (1) within a reasonable time after the defect was discovered or should have been discovered; and (2) before any substantial change occurs in the condition of the item, unless the change is due to the defect in the item.
>
> ....

---

[1] The EUC was essential to the process of obtaining an export license from the country in which the supplier of the arms or ammunition was located (tr. 1/60-61, 64). Because it was such an important document, AEY's practice was to include a draft of the EUC along with each submitted request to ensure the accuracy of the EUC (tr. 1/61).

[2] The government does not dispute this interpretation.

(f) Excusable delays. The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

....

(m) Termination for cause. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

## Contract Delivery Dates

4. Contract M-0670 required delivery 45 days after receipt of EUC (R4, tab 1 at 6). It contained the following line items with country, date of receipt of EUC, and original contract delivery date indicated:

CLIN 0001—universal laser bore sight system (20), complete with 4 adaptors, carrying pouch, batteries and instructions. EUC for U.S. received 6 September 2007 (R4, tab 27), making delivery due 22 October 2007.

CLIN 0002—Remington 870 Express 12 gauge shotgun (106), with three magazines. EUC for U.S. received 6 September 2007, making delivery due 22 October 2007.

3

CLIN 0003—Sniper Rifle, 7.62 x 5mm (48), to include 3 magazines, backup (adjustable) sights, bayonet mount. EUC for U.S. received 6 September 2007, making delivery due 22 October 2007.

CLIN 0004AA—AK-47 w/fixed stock (50-50 fixed/folding stock acceptable) (30,000), to include sling, 4 magazines, and cleaning kit. A corrected EUC for Montenegro for 16,000 AK-47s was received 15 October 2007 (R4, tab 46; tr. 1/161), making delivery due 29 November 2007. The EUC for the remainder of the AK-47s (14,000), sourced from Croatia, had to be re-done due to a missing import certificate, and the corrected EUC was not received until 3 April 2008 (R4, tab 108), making delivery due 19 May 2008.

CLIN 0004AB—AK-47s (100)—later terminated for convenience.

CLIN 0005—Tool kit, small arms repair (1). The record does not clearly establish when the U.S. EUC was issued.

CLIN 0006AA—DShK 12.7 x 107mm machine gun (287), to include 3 magazines and tripod. EUC for the Czech Republic was received on 28 February 2008 (R4, tab 99 at 2), making delivery due 14 April 2008.

CLIN 0006AB—DShK (2)—later terminated for convenience.

CLIN 0007AA—Machine gun light RPK 7.62 x 39mm (404), to include bipod and 3 magazines. A corrected EUC for Montenegro was received 15 October 2007 (R4, tab 46), making delivery due 29 November 2007.

CLIN 0007AB—Machine gun light RPK (114). EUC for Montenegro was received 6 September 2007 (R4, tabs 30, 33), making delivery due 22 October 2007.

CLIN 0008AA—Shipping costs in the amount of $69,000.00.

CLIN 0008AB—Shipping costs in the amount of $656,985.00.[3]

(R4, tab 1 at 2-3)

5. Contract M-0815 had only one CLIN, for 25,000,000 rounds of 7.62 x 39mm ball ammunition (new surplus) for the AK-47s (R4, tab 3 at 2; tr. 1/54). Delivery was

_____

[3] CLIN 0008AA appears to be for shipping costs for weapons intended for the use of the Iraq MOI at Abu Ghraib, while CLIN 0008AB appears to be for shipping costs for weapons intended for the use of the Iraq MOD (R4, tab 149, AEY invoice for the 29 January 2008 delivery).

4

due 45 days after receipt of EUC (R4, tab 3 at 7). An EUC for the Czech Republic was requested by AEY on 2 October 2007, but a correct EUC was not received until 11 November 2007, making delivery due 27 December 2007 (R4, tabs 4, 52).

6. Contract M-0010 had multiple CLINs with delivery due 60 days after receipt of EUC (R4, tab 24 at 2, 5):

CLIN 0001—60mm mortar base plate w/ tripod (48); EUC for Serbia received 7 February 2008 (R4, tab 86), making delivery due on 7 April 2008.

CLIN 0003—AK-47 w/fixed stock including sling, 4 magazines, cleaning kit, and blank firing attachment (3932). EUC for Serbia received 7 February 2008, making delivery due 7 April 2008.

CLIN 0004—DShK machine gun M-38/46, cartridge 12.7 x 107mm, caliber 12.7, rate of fire 600 rounds/min., feed system: belt 50 rounds (54). EUC for Czech Republic received on 7 February 2008 (R4, tab 84), making delivery due 7 April 2008.

CLIN 0005—Plotting board, indirect fire, M19 to include case (48). EUC for Serbia received 7 February 2008, making delivery due 7 April 2008.

CLIN 0006—Sight unit M64 series (48). EUC for Serbia received 7 February 2008, making delivery due 7 April 2008.

CLIN 0007—Modernized small arms repair kit (224). EUC for the U.S. received 28 February 2008 (R4, tab 99), making delivery due 28 April 2008.

CLIN 0008—Sniper rifle to include scope, sight, and three magazines (60). EUC for the U.S. received 28 February 2008, making delivery due 28 April 2008.

CLIN 0009—Spotter scope (60). EUC for the U.S. received 28 February 2008, making delivery due 28 April 2008.

CLIN 0010—Machine gun light RPK 7.62 x 39mm (496). EUC for Serbia received 7 February 2008, making delivery due 7 April 2008.

CLIN 0012—Shipping charges of $214,390.00.

AEY received the EUCs for CLIN 0004 (Czech Republic) and CLINs 0001, 0003, 0005, 0006, and 0010 (Serbia) on 7 February 2008 (R4, tabs 84, 153), making delivery of those items due on 7 April 2008. AEY received the EUC for CLINs 0007, 0008, and 0009 (U.S.) on 28 February 2008 (R4, tab 99 at 2), making delivery due 28 April 2008.

5

7. Contract C-0005 had only one CLIN, for 39 million rounds of 5.56 x 45mm M855 full metal jacket ball ammunition, with delivery due 60 days after receipt of EUC (R4, tab 5 at 1-2). In November of 2007, before the contract was officially awarded but after AEY had been informed that it was the apparent successful bidder, AEY was approached by Mr. Mark Morales of Allied Defense Group, a U.S. firm, about the possibility of sourcing the ammunition with Alliant Techsystems (ATK) (tr. 1/115-16). Prior to this, AEY had intended to source the ammunition with a supplier in Serbia but was also considering a supplier in the United Arab Emirates (UAE) (tr. 1/119-20). Efraim Diveroli, AEY's president, testified that these suppliers would have a lower price but the ammunition would be shipped by air, whereas the American ammunition, being of higher quality, might be more expensive and shipping by sea, while it would be less expensive than air, would be slower and would not meet the contract's requirement to deliver within 60 days of receipt of EUC. (Tr. 1/116-17) Mr. Diveroli spoke with the JCCI contracting officer (CO), TSgt David Goff, prior to award of the contract, to inform him of the opportunity to source from ATK vs. the other suppliers and the fact that it would mean an extended delivery schedule (tr. 1/117).

8. CO Goff gave the assent to source from ATK after checking with the customer, MNSTC-I/J4 (tr. 1/119). As a result, AEY entered into a subcontract with MECAR, USA, an affiliate of Allied Defense Group, for the ATK ammunition on 7 December 2007, one day before Contract C-0005 was officially awarded (R4, tab 147). The subcontract contained estimated delivery dates: 3 million rounds on 28 February 2008, 7 million rounds on 1 April 2008, 7 million rounds on 30 April 2008, 7 million rounds on 31 May 2008, 7 million rounds on 30 June 2008, and 8 million rounds on 31 July 2008 (id.). AEY received the EUC for the U.S. on 7 February 2008 (R4, tab 154), making delivery due on 7 April 2008 per the contract. AEY had already applied for and received a U.S. export license for the ammunition on 1 February 2008 (tr. 1/123).

9. Contract M-0040 contained multiple CLINs and required delivery 60 days from receipt of EUC (R4, tab 8 at 2, 7):

CLIN 0002—AK-47 w/folding stock, 4 magazines, cleaning kit (43)

CLIN 0006—Launcher: Grenade M203A1 (32)

CLIN 0007—Machine gun 5.56mm: M249 (39)

CLIN 0008—Machine gun caliber .50: Browning M2, HB flexible W/E (6)

CLIN 0009—Machine gun grenade 40mm MK19 Mod III (4)

CLIN 0010—Machine gun 7.62mm M240B (19)

CLIN 0011—Machine gun 5.56mm MK46 Shorty Saw (4)

6

CLIN 0012—Machine gun 7.62mm MK48 Shorty (8)

CLIN 0013—Tripod mount machine gun .50 caliber (6)

CLIN 0014—Tripod mount machine gun M240B (16)

CLIN 0015—Tripod mount machine gun MK19 (4)

CLIN 0016—vehicle mount machine gun .50 caliber (6)

CLIN 0017—vehicle mount machine gun MK19 (4)

CLIN 0020—Burris Spotting Sniper Scope 20-60 x 80mm Landmark Spotting Scope (12)

CLIN 0021—Shotgun 12-gauge Remington 870 MCS (5)

CLIN 0022—Submachine gun 9mm MP5 (25)

CLIN 0026—Suppressor submachine gun MP5 (25)

CLIN 0027—Tactical light carbine 5.56mm M4A1 (980)

CLINs 0002, 0008, and 0013 were to be acquired from Serbia and AEY received that EUC on 7 February 2008 (R4, tabs 151-52), making delivery due 7 April 2008. CLIN 0022 was to be acquired from Pakistan and that EUC was received on 21 February 2008 (R4, tab 182), making delivery due 21 April 2008. The remainder of the items were to be acquired from the U.S. and this EUC was received on 21 February 2008 (R4, tabs 92, 182; tr. 1/205-06), making delivery due 21 April 2008.

*AEY's Progress toward Delivery*

Contract M-0670 (ASBCA No. 56591)

10. For CLINs 0001, 0002, and 0003 (universal laser bore sight systems, 12-gauge shotguns, and sniper rifles from the U.S.), the contract delivery date was 22 October 2007 (finding 4).[4] However, the U.S. export license originally issued on 30 October 2007 incorrectly identified the Iraq MOI as the end user, and a corrected export license identifying the end user as MNSTC-I was not issued until 27 March 2008 (tr. 1/165; R4, tabs 355, 363, 428). All the U.S. items were delivered to Lufthansa on

---

[4] As noted in finding 4, the date of receipt of an EUC for CLIN 0005 (small arms repair kit) is not apparent from the record. However, knowing this date is not necessary to our decision since this item was delivered and accepted.

7

15 April 2008 and arrived in Baghdad on 22 April 2008 (tr. 2/213-14). The government executed DD250s confirming delivery on 28 April 2008, and officially accepted the items on 2 June 2008 (R4, tabs 115, 278 at 1-2). With the exception of the universal laser bore sights, delivered quantities in full satisfaction of contract CLIN quantities were accepted.[5]

11. On 29 January 2008, a partial AEY shipment arrived at Baghdad and was transported thereafter to the Abu Ghraib Warehouse (AGW). This shipment consisted of 4,105 AK-47s[6] under CLIN 0004AA, 404 RPK light machine guns under CLIN 0007AA, and 114 RPK light machine guns under CLIN 0007AB. (Tr. 1/185-86; R4, tabs 78, 89, 149)

12. By Report of Discrepancy (ROD) issued to AEY on 16 February 2008, the government informed AEY that its 29 January 2008 shipment to AGW was missing accessories under CLIN 0004AA as follows: 1,089 cleaning kits, 107 blank firing adaptors, 174 pouches, and 160 slings (R4, tab 90). In addition, one rifle appeared to be damaged and several appeared to be used rather than new (id.). The ROD further noted that 13 of the RPKs delivered under CLINs 0007AA and 0007AB had folding rather than fixed stocks and all RPKs had come with 30 round magazines, not the specified 40 round magazines (id.). Finally, it was noted that "most" of the crates "just look like a wooden box not wooden crate to store weapons and accessories" and that "[t]hese crates had no inside wooden partitions to separate the weapons from the accessories...and to keep them in row[s] so it will be easy to be counted" (id.).

13. AEY agreed to repackage the improperly packaged AK-47s and to supply the missing accessories (tr. 2/22-25; R4, tab 94). On 19 February 2008, CO Goff sent an email to quality assurance personnel at AGW summarizing the agreement reached with AEY to fix problems with the shipment (R4, tab 93). He asked the AGW personnel to sort the shipments into four categories: (1) weapons that arrived in good condition with acceptable packing and accessories—these should be accepted; (2) weapons with "questionable packing" should be sorted into two subcategories: weapons in good condition (should be accepted if it is just the bracing that is deficient); and weapons with significant cosmetic damage or that will require work to be functional (these should be

_____

[5] It appears that only 19 of the 20 universal laser bore sights were accepted, but the record is unclear as to the reason (R4, tab 278 at 2).

[6] The delivered quantity included 100 AK-47s originally ordered under CLIN 0004AB that were applied to CLIN 0004AA after the government terminated CLIN 0004AB for convenience. The remainder of the AK-47 shipment was the amount approved (4,005) under the Montenegro export license issued 25 December 2007. (R4, tab 385) The record does not reflect when or if Montenegro ever issued an export license for the remainder of the 16,000 AK-47s that were to be sourced from that country.

set aside); (3) crates that were shipped without any bracing at all should be set aside;[7] and (4) crates that have acceptable weapons but are missing accessories can be accepted if the missing items can be filled in from an otherwise unacceptable crate (*id.*). The record does not contain any indication of whether this sorting process was actually carried out or its results. However, AEY proceeded to order the accessories that had been reported to be missing and these were shipped to Baghdad from Montenegro on 9 April 2008 (R4, tab 113 at 3), delivered to AGW, and inspected and passed by quality assurance on 5 May 2008 (R4, tab 93 at 4; tr. 2/202).

14. AEY reported to CO Goff on 30 March 2008 that it had arranged with another company, SkyLink Arabia (SkyLink), to pick up the crates that needed to be repacked and perform the repacking "within the next 14 days" (R4, tab 103 at 1). On 26 April 2008, SkyLink reported to AEY that the crates they had been given were "all fixed up" and ready to be delivered back to AGW, specifically noting that they "were informed by Abu Ghraib that there were only 130 crates that needed attention" (R4, tab 113 at 1). Per an AGW "Data Collection Sheet," the 1,300 re-crated AK-47s (10 weapons per crate) were inspected and accepted on 5 May 2008 (R4, tab 93 at 4).

15. For the RPKs under CLINs 0007AA and 0007AB, the government ultimately (nearly six months after delivery) agreed to accept them despite the noted discrepancies in return for the consideration of a reduced price of $239.98 per weapon (R4, tabs 138, 325 at 2; tr. 3/47).

16. The only CLINs on Contract M-0670 that were not ultimately delivered and accepted were the remainder of CLIN 0004AA (25,895 AK-47s) and CLIN 0006AA (287 DShK machine guns).

## Contract M-0815 (ASBCA No. 56470)

17. The only CLIN on Contract M-0515 was CLIN 0001 for 25 million rounds of ball ammunition for the AK-47s. Although the contract delivery date was 27 December 2007 based on receipt of the EUC (finding 5), the Czech Republic did not issue an export license until 21 January 2008. In anticipation of receipt of the export license, AEY began arrangements to ship the ammunition in early January and requested pricing for air transport to Baghdad Airport (BGW) from Pardubice Airport (PED) in the Czech Republic (tr. 1/96; R4, tab 388). Following issuance of the export license, AEY entered into an aircraft charter contract for multiple routes, including PED-BGW, with Galaxy Air dated 26 January 2008 (tr. 1/100-01; R4, tab 398 at 4th page, tab 404). AEY reported to CO Goff on 28 January 2008 that they expected to begin shipments, thirteen flights in all, by the middle of February 2008 (tr. 1/102; R4, tab 77).

---

[7] Whether the contract actually required the weapons and accessories to be shipped in crates with interior partitions is not at all clear (R4, tab 1).

9

18. Shipping arms by air requires permission from each country over which the aircraft will fly (known as overflight permits), as well as landing permits from each airport at which the aircraft will land (tr. 1/103, 2/128). While obtaining the necessary permits was, in the first instance, the responsibility of the carrier, it was not unusual in AEY's business for the carrier to request assistance from AEY in facilitating the permits, as Galaxy Air did on 29 January 2008 with respect to permits for Turkey, Romania, and Hungary (R4, tabs 405, 408). Turkey was a particularly difficult country from which to obtain a permit (tr. 1/103). Preparations for the first shipments continued in early February, with AEY reporting to CO Goff on 10 February 2008 that the first shipment would arrive on 27 February 2008 and that there would be 13 consecutive flights, 1 per day (R4, tab 88 at 2). The flight plan called for operations to begin on 26 February with a positioning flight into PED and continue thereafter through 15 March 2008 (tr. 1/107; R4, tab 415 at 8th page).

19. Although all needed permits had been secured, Galaxy Air was not able to commence flights on 26 February 2008 as planned due to a fuel shortage in Baghdad, which AEY reported to CO Goff (tr. 1/109; R4, tab 97). The unavailability of fuel in Baghdad meant that an aircraft landing at BGW would not thereafter be able to refuel to take off. AEY further informed the CO that the goods were in a warehouse at PED and were ready to ship, and that it was seeking other carriers who might have devised a work-around for the fuel shortage (R4, tab 97). During the month of March, AEY contacted numerous carriers, including JLM Aviation, which offered AEY estimated delivery dates in April of 2008 (R4, tab 430). As of the end of March, AEY was still searching for a solution to the fuel shortage, and kept CO Goff apprised of the situation (R4, tabs 102-03).

Contract M-0010 (ASBCA No. 56471)

20. The Serbian export license for CLINs 0001 (48 60mm mortar base plate with tripod), 0003 (3,932 AK-47s), 0005 (48 plotting boards), 0006 (48 M64 series sight units), and 0010 (496 RPK machine guns), all of which were to be delivered by 7 April 2008, was delayed (as were other Serbian export licenses during this period). AEY believed the delays were due to political tensions with the U.S. over the issue of independence for Kosovo (tr. 1/189). The shipment had been inspected by AEY to ensure it met standards and thereby avoid the problems experienced under Contract M-0670 with the AK-47s, and AEY reported to CO Goff on 9 February 2008 that there were no problems with the AK-47s in this shipment (R4, tab 155; tr. 1/191-94).

21. The Czech Republic export license for CLIN 0004 (54 DShK machine guns) was also delayed. In a status report dated 11 April 2008, AEY anticipated receipt of both the Czech and Serbian licenses "in the next 21 days" or by 2 May 2008. (R4, tab 109)

22. For the U.S. items due 28 April 2008, CLINs 0007, 0008, and 0009 (224 small arms repair kits, 60 sniper rifles, 60 spotter scopes), AEY had applied for an export

10

license in advance of receipt of the EUC and received the export license for CLINs 0007 and 0009 on 4 February 2008 and for CLIN 0008 on 24 February 2008 (R4, tab 333 at 12th and 19th page). These goods were consolidated for shipment via air on 21 April 2008 with U.S. items under Contract M-0040 (R4, tabs 103, 109).

Contract C-0005 (ASBCA No. 56473)

23. On 21 December 2007 AEY, in its regular weekly status report to JCCI, communicated to CO Goff that it expected to have firm delivery dates soon for Contract C-0005 (R4, tab 67 at 2). In February 2008, MECAR informed AEY that the first delivery date would slip by roughly a month and proposed to consolidate the shipments into three, as follows:

> 13 million rounds, 25 March to 5 April 2008
> 13 million rounds, 25 May to 5 June 2008
> 13 million rounds, 25 July to 5 August 2008

(R4, tab 187 at 1; tr. 1/210) Later in February 2008, MECAR again pushed back the date of the first shipment to 14 April 2008 (R4, tab 190). On a regular basis, CO Goff was kept advised of the expected shipping dates for the ammunition (tr. 1/212; R4, tabs 194, 218). On 30 March 2008, AEY notified CO Goff in its weekly progress report that the first 13 million rounds of ammunition had been manufactured and were being packaged and prepared to be loaded for ocean shipment and that the second 13 million rounds were in production (R4, tab 103; tr. 2/69-70).

Contract No. M-0040 (ASBCA No. 56472)

24. CLINs 0002 (43 AK-47s), 0008 (6 Browning machine guns), and 0013 (6 tripod mounts), were due on 7 April 2008, but as of the end of March 2008 AEY and its supplier were still waiting for Serbia to issue an export license, which they believed was being intentionally delayed by the Serbian government due to political tensions with the U.S. over Kosovo. (Tr. 2/55) CLIN 0022 (25 9mm submachine guns) was due on 21 April 2008, and the Pakistan export license was also delayed, purportedly due to a transition of the Pakistani government (tr. 2/56). At the end of March 2008, AEY believed it would be able to ship from both countries by mid-April 2008 (R4, tab 103).

25. The remainder of the CLINs were sourced in the U.S. and were due 21 April 2008. AEY received the necessary U.S. export licenses on 31 January 2008 for the accessories and 7 February 2008 for the small arms (R4, tabs 356, 359). AEY decided to consolidate shipment of these items with the small arms being sourced from the U.S. under Contract M-0010 and informed the government in its 12 April 2008 status report that it would ship both on 21 April 2008 (R4, tab 109).

26. On 25 March 2008 the Army suspended AEY from future government contracts due to issues with ammunition supplied under a contract not involved in these appeals (tr. 2/58-62). The action received press attention in the form of a New York Times article, which caused problems with some of AEY's suppliers, and which in Mr. Diveroli's view caused a change in the government's attitude toward AEY (tr. 2/69, 2/82-83).

27. On 31 March 2008, CO Goff was redeployed and his supervisor, LTC Jonathan McColumn, took over as CO on the five AEY contracts that are the subject of this appeal.[8] Mr. Erwin Fernandez, an acquisition analyst employed by CACI International, Inc., was assigned to assist LTC McColumn in administering the contracts. (Tr. 2/66)

28. On 29 March 2008, CO Goff requested a status update on all five contracts for the benefit of his successor (R4, tab 233). AEY acknowledged the request and reminded CO Goff in an email dated 29 March 2008 that fuel unavailability in Baghdad was delaying several large shipments and requested any ideas he might have for dealing with the problem (R4, tab 234). On 30 March 2008, CO Goff sent an email stating that the ammunition under Contract M-0815 was urgently needed by the end users, that the contract was late, and that AEY needed to provide a delivery date. CO Goff further added that due to AEY's "current situation," AEY needed to ensure that the ammunition was in "a usable condition." (R4, tab 235) AEY responded in its 30 March 2008 status update on the five contracts (on which Mr. Fernandez was copied) that the ammunition had been prepared for shipment and was stored in a warehouse at PED, that none of the carriers they had talked to could fly without fuel availability at Baghdad, but they had heard that the shortage might abate soon and would fly as soon as they could. AEY further assured CO Goff of the quality of the ammunition and reminded him that they had previously supplied it under an earlier contract with no issues. (R4, tab 236)

29. On 31 March 2008 Mr. Fernandez replied, thanking AEY for the prompt response and inquiring if there was any way that AEY could ship just a portion of the ammunition "NOW." AEY responded on 1 April 2008 confirming that the ammunition had been sitting in a PED warehouse since 26 February 2008[9] due to the unavailability of fuel in Baghdad and asking whether it would be possible to have its cargo aircraft land on the military side of the airport (BGW) because if AEY could obtain the necessary permissions the entire delivery could be completed within 30 days from the first flight (R4, tab 104). Mr. Fernandez responded that he would see what he could do about the

---

[8] At the time of the hearing in these appeals, LTC McColumn had attained the rank of Brigadier General. This decision will refer to him as LTC McColumn.

[9] AEY had been paying for airport storage of this shipment since the beginning of the Baghdad fuel shortage on 26 February 2008 (tr. 2/68).

fuel issue since the ammunition was needed ASAP (R4, tab 239). However, AEY never received a response to its request (tr. 2/65).

30. On 2 April 2008 Mr. Diveroli of AEY sent an email to Mr. Fernandez and LTC McColumn requesting a call to discuss several contract matters, including the fuel shortage (R4, tab 253; tr. 2/66). The call was scheduled for the next day, 3 April 2008 (R4, tab 254). During the call, in which Mr. Diveroli participated on behalf of AEY and LTC McColumn and Mr. Fernandez participated on behalf of the government, LTC McColumn emphasized the importance of AEY making progress sufficient to instill some confidence in him and his superiors that deliveries were imminent (tr. 2/96, Diveroli). The discussion covered all five contracts[10] and was memorialized by Mr. Fernandez in a memorandum to file dated 4 April 2008:

> On 3 Apr 08, a conference call was conducted with AEY and the following was discussed:
>
> -Deliveries of all contracts
> -Lt Col McColumn wants ktr to provide immediate plan to show the government confidence that a delivery will be made very soon. The plan will consist of the following information: 1. When he will deliver, 2. If ktr cannot deliver by the mod delivery schedule, when would be the next delivery date, 3. [sic]
>
> -Ktr asked if contracts will be terminated if current delivery schedule is not met—KO made no promises as to whether contracts would be terminated or not if current delivery schedule is not met.
> -Made Ktr aware to show the government some sign of delivery by 15 Apr 08. If no sign of delivery is made at this point, KO will determine course of action whether to terminate or not.
> -Ktr asked if government accept possible novation to the contracts—KO responded that it will be looked upon but if it causes more delays to the deliveries, it might not be pursued. Ktr tried to talk about the company's legal battle with the government—KO responded that he would not discuss any AEY's legal issues with government.

---

[10] Contracts M-0670, M-0040, M-0815, M-0010, and C-0005. The memorandum mistakenly references Contract M-0861 (another AEY contract) instead of Contract M-0040 (R4, tab 13).

13

-If ktr continue to make excuses and prolong delivery, KO considered sending a show-cause notice.

(R4, tab 13)

31. Mr. Diveroli testified that he was not sure where the 15 April 2008 date came from, but possibly from the fact that he had told LTC McColumn during the call that certain deliveries were imminent. He did not understand from the call that AEY would be terminated if it failed to "show some sign of delivery" by 15 April, and LTC McColumn had told him to expect a show cause notice. Mr. Diveroli explained to LTC McColumn the complicated process of delivering arms in a war zone, including the need for export licenses and overflight and landing permits to be issued, a process that was to a significant extent out of AEY's control. What he heard in response from LTC McColumn was that AEY needed to show him some kind of delivery, that something was happening, because he had people he reported to. (Tr. 2/99-101)

32. LTC McColumn agreed that in the 3 April 2008 meeting he requested "some sign of delivery by April 15th." He termed it a "benevolence to say, give me some indicator, something needs to show up...I need to see a sign. The J4, which was the requiring activity, needed to see a sign that supplies were going to increase with consistency in delivery." (Tr. 4/47)

*AEY's Efforts to Make "Some Sign of Delivery" by 15 April 2008*

Contract M-0815

33. On 4 April 2008, AEY reported to Mr. Fernandez in its regular weekly status report that it had contracted with a carrier (JLM Aviation) "who claims to have solved the fuel issue" and it "should" be able to begin shipping on 11 April 2008. AEY added that all overflight and landing permits had been applied for and shipments would start once the approvals were in place. (R4, tab 261; tr. 2/114) On 8 April 2008, AEY's carrier reported to it that three of seven overflight permits had been received and the rest were expected that afternoon or the next day (R4, tab 441).

34. AEY contacted the Director of Operations at PED, Vit Malek, to enclose an air operations certificate for the aircraft and inquire whether they could begin operations on 14 April 2008. Mr. Malek replied on 8 April 2008 that operations could commence on 14 April, however, "Military close airport 21-25 APR 08 and 19-23 MAY 08." (R4, tab 442 at 1, 3) On 10 April 2008 AEY followed up with its carrier seeking the overflight permit application for Turkey and "request application" for the Regional Air Movement Coordination center in Iraq, emphasizing "WE NEED THIS NOW!!!!!!!!" (R4, tab 444). After receiving documents from JLM, Mr. Diveroli followed up on Friday, 11 April 2008, and sought assurances the carrier would be set to fly on Monday,

14 April 2008 (R4, tab 444 at 4; tr. 2/121-22) He was assured that the aircraft would be at PED on Sunday, 13 April 2008 (R4, tab 444 at 5).

35. Early on the morning of Saturday, 12 April 2008, AEY received word that the Saudi Arabian overflight permit and the PED (LKPD) landing permit were still in process and that the duty officer at PED had advised the flight must be delayed until Monday when the approving body resumed office (R4, tab 450 at 1, 3; tr. 2/127-28). Later on Saturday, the Saudi overflight permit was approved, leaving only the PED landing permit outstanding (R4, tab 454 at 3; tr. 2/129-30). On Sunday, 13 April 2008, Mr. Diveroli emailed the carrier asking if the airplane had taken off for PED yet, and on Monday, 14 April 2008, AEY wired $110,000 in payment for the first flight to Liberty Air, the broker for JLM Aviation (R4, tabs 457, 274). Also on Monday, Mr. Diveroli emailed the AEY team with the flight schedules from PED to BGW and instructed them to closely coordinate on the series of flights that week (R4, tab 458; tr. 2/134-35).

36. However, while AEY was waiting for the landing permit, the Turkey overflight permit expired (tr. 2/136-38; R4, tab 458). The record is less than clear about when the overflight permit expired and when AEY received the landing permit, although it appears that the overflight permit had expired by Monday, 14 April 2008 (R4, tab 458; tr. 2/157-60). It is also unclear if or when the Turkey overflight permit was renewed. However, as of 14 April 2008, AEY had reason to believe it would be able to commence flights on the 17th and 18th of April. (R4, tab 459; tr. 2/138-39)

37. Shortly thereafter, AEY learned that that PED would close on Friday, 18 April 2008 for military operations, three days earlier than the dates originally given to AEY. Because the early closure did not allow AEY to schedule flights on the 17th and 18th of April, AEY sought special permission from the PED Director of Operations to schedule flights over the weekend (19 and 20 April 2008). However, even with the offer of special fees, this request was refused. (Tr. 2/146-47; R4, tab 365) On 15 April 2008, AEY reported the situation to Mr. Fernandez (R4, tab 276). AEY attached correspondence from JLM Aviation to confirm that the only reason for further delay at this point was the airport closure, and also attached a copy of the wire transfer to show that the first flight had already been paid for (id., R4, tab 249). Both AEY and JLM assured the government that flights would resume on 28 April 2008 at a rate of one per business day, 12 flights in all (id.).

Contract M-0010

38. As noted earlier, AEY was awaiting the issuance of delayed export licenses from both Serbia and the Czech Republic for CLINs 0001, 0003, 0004, 0005, 0006, and 0010 (findings 20, 21). Mr. Diveroli testified that AEY had "zero direct control" over the length of time it would take for an export license to issue, other than speaking to its suppliers and urging them to "push" their government, which AEY frequently did (tr. 1/64). The remainder of the CLINs were U.S. items due on 28 April 2008 that had

been consolidated with items for Contract M-0040 and were to ship from the U.S. on 21 April 2008 per AEY's 30 March 2008 status report (R4, tab 103).

Contract C-0005

39. AEY had notified the government in its status report dated 30 March 2008 that the first 13 million rounds of ammunition were palletized and being prepared for ocean shipment and the second 13 million rounds were in production (finding 19). On 1 April 2008, Marc Morales of Allied Defense Group (AEY's supplier on this contract) emailed Mr. Fernandez directly, expressing concern about the effect of AEY's suspension and/or contract stop-work orders (*see* finding 26) on Allied (R4, tab 247). Mr. Morales inquired whether the Army would consider assigning the contract to Allied if AEY agreed (*id.*). In closing, he stated that Allied planned to deliver the rounds to AEY as follows: 13 million rounds by 14 April 2008, 13 million rounds by 31 May 2008, and 13 million rounds by 31 July 2008 (*id.*).

40. On 4 April 2008, AEY wrote to Mr. Fernandez, informing him that the first 13 million rounds of ammunition were ready for shipment and that AEY planned either to novate the contract to Allied or to ship via air (rather than sea) in the next few days (R4, tab 261). Mr. Diveroli testified that the decision to change shipping method (with air being considerably faster but also significantly more expensive) was made after it became apparent to him that LTC McColumn did not intend to honor AEY's prior agreement with CO Goff trading the higher quality U.S.-made ammunition in return for an extended delivery schedule (tr. 2/170).

41. AEY's corporate counsel, Marko Cerenko, followed up on the potential novation of AEY's contract to Allied in an email to LTC McColumn dated 8 April 2008 (R4, tab 268). Mr. Cerenko informed LTC McColumn that Mr. Fernandez did not think a novation of Contract C-0005 was possible, and asked either for a contact in JCCI's legal office, or LTC McColumn's own views on the matter, reiterating that input from the government on whether it would allow novation was needed "fairly quickly." AEY's contract with MECAR and a sample novation agreement were attached. (*Id.*) Not having heard back from LTC McColumn, AEY's Mr. Cerenko sent him another email on 10 April 2008, reiterating that both parties were ready to move forward with the novation but needed to hear from him in order to do so, and had not heard from him despite "numerous" attempts to contact him (R4, tab 271 at 1).

42. On 8 April 2008, ATK contacted MECAR to say that the Army's recent decision to suspend AEY from future contracting had caused ATK to reevaluate the terms of the agreement, and that ATK had concluded that advance payment prior to shipping was required to protect it from undue financial risk. An invoice for the first shipment of 13 million rounds was attached. (R4, tab 271 at 3) AEY sent payment to MECAR for this invoice in the amount of $3,845,800 on 18 April 2008 (R4, tab 466 at 2; tr. 2/184).

43. Concurrently, AEY arranged for air shipment for the initial 13 million rounds. By 11 April 2008 it had lined up a 747 to fly the first leg from the U.S. to Kuwait (R4, tabs 109, 448; tr. 2/172) and by 12 April 2008 had arranged for ferry flights from Kuwait to Baghdad (R4, tab 451; tr. 2/182-83). On Friday, 18 April 2008, AEY provided Mr. Fernandez with a notice of assignment of claims required by ATK before it would release the cargo for shipment and requested that it be promptly processed, so that AEY could start shipping the ammunition on Friday, 24 April 2008 (tr. 3/5; R4, tab 286).[11]

Contract M-0040

44. In early April 2008, AEY was still awaiting the Serbian and Pakistan export licenses needed to ship CLINs 0002, 0008, 0013 and 0022. AEY's supplier in Pakistan informed AEY on 5 April 2008 that it expected the export license for CLIN 0022 to issue in a week (R4, tab 438 at 2; tr. 1/207-08), an estimate later pushed back to 2 May 2008 (R4, tab 284 at 4; tr. 3/102-04). AEY also expected its Serbian export license to issue by 2 May 2008 (R4, tab 109; tr. 3/95). The U.S. goods (CLINs 0006, 0007, 0009-0012, 0014-0021, 0026 and 0027) had been consolidated for shipment on 21 April 2008 with U.S. items under Contract M-0010, as reported in AEY's status report dated 12 April 2008 (R4, tab 109; tr. 3/96).

*The First Four Contract Terminations*

45. On Monday, 17 April 2008, LTC McColumn terminated Contracts M-0815, M-0010, M-0040, and C-0005 for cause (R4, tab 18). Contract M-0670 was not included in this action. The reason given for termination was AEY's failure to deliver the contract items by 15 April 2008 (*id.*). The 17 April 2008 notice was followed by a final decision dated 24 April 2008 setting forth the rationale for LTC McColumn's decision to terminate the contracts (R4, tab 20).

46. The final decision stated the following with respect to the four terminated contracts:

Contract M-0815

> The contractual period of performance for delivery was 27 December 2007. For months, AEY repeatedly failed to meet its own promises to deliver. In an email to the Government dated 30 March 2008, Mr. Diveroli claimed that shipment was delayed because there was "no fuel in Baghdad

---

[11] Mr. Diveroli testified that with the assignment of claims, ATK would need only half the payment up front in cash, but he was of the mind that the assignment would not be processed quickly enough by the government, so he had decided to expedite matters by providing full payment (tr. 3/7-8).

now for cargo aircrafts." However, commercial cargo airlines know that fuel is generally not available in Baghdad for commercial flights and therefore arrange to load aircraft appropriately to be able to return to an airport that sells fuel. Aircraft either reduce capacity for each aircraft and increase aircraft total numbers, or schedule a stop at an intermediate refueling airport enroute. On 3 April 2008, the Government informed Mr. Diveroli in a telephone conversation that the Government would require at least partial delivery no later than 15 Apr 08. In his follow-up email dated April 5, 2008, Mr. Diveroli established a revised schedule that committed to "begin to ship this cargo next Friday 4/11/08." At some point after the 11th of April, Mr. Diveroli contacted Col Mark Morrison of the requiring activity directly and told him that the shipment would start on 15 April 2008. In an email to the Contracting Officer dated 16 Apr 2008, Mr. Diveroli stated that the fuel and traffic problems were solved, but that "suddenly and unexpectedly" an airport in the Czech Republic closed "the rest of this week and all of next week" and would prevent AEY from having your "first flights ready for departure: until the 28th of April. However, the unsigned letter from a Mr. Radek Klima, Pardubice Airport Handling Department, attached to Mr. Diveroli's email contradicted Mr. Diveroli's claims. Mr. Klima's letter stated that "according to military scheduled airport maintenance programme [sic]," the airport would be closed from Monday, 21 April 2008 until 25 April 2008, 1500 hours. Even if this unsigned letter is taken at face value, the closure did not begin until 21 April. The 21 April date is well after the 11th of April promised by Mr. Diveroli. Further, these dates did not include the "rest of this week (week of 16th) as Mr. Diveroli stated; and apparently the closure was part of a scheduled maintenance program, not a sudden and unexpected closure, indicating a negligent failure to plan. When shipment of cargo failed to occur according the revised schedule committed to by Mr. Diveroli, the undersigned terminated the contract for cause on 17 April 2008. The Contract [sic] Officer determined that AEY's professed reasons for delay were not supported by the facts, lacked credibility, and did not constitute excusable delays.

18

## Contract M-0010

The contractual Period of Performance for this contract was 10 April 2008. On 3 April 2008, the Government informed Mr. Diveroli in a telephone conversation that the Government would require at least partial delivery no later than 15 Apr 08. In his follow-up email dated April 5, 2008, Mr. Diveroli stated "M0010—Export license for DshK [sic] and mortar items should be received in the next 25 days and charter from Serbia flight will follow immediately. Balance of items shall originate from CONUS and will be shipped by air cargo along with the M0040 shipment." In emails dated 14 and 15 April 2008, Mr. Diveroli indicated that an unexpectedly closed airport in the Czech republic and delays in export licenses were delaying delivery. This contradicted Mr. Diveroli's previous email that stated a "Serbia" flight would execute delivery and that the "balance of items shall originate from CONUS." When shipment of cargo failed to occur according to the revised schedule of 15 April 2008, the undersigned terminated the contract for cause on 17 April 2008. The Contract [sic] Officer determined that AEY's professed reasons for delay were not supported by the facts, lacked credibility, and did not constitute excusable delays.

## Contract M-0040

The contractual Period of Performance for this contract was 10 April 2008. On 3 April 2008, the Government informed Mr. Diveroli in a telephone conversation that the Government would require at least partial delivery no later than 15 Apr 08. In his follow-up email dated April 5, 2008, Mr. Diveroli stated, "M0040. All weapons and accessories are ready to ship and export license has been received. We are in the process of consolidating all cargo at a licensed warehouse in Miami and we shall ship everything in one shipment by the 15th of April." When shipment of cargo failed to occur according to the contractual period of performance and the assurances of Mr. Diveroli, the undersigned terminated the contract for cause on 17 April 2008.

## Contract C-0005

The contractual Period of Performance for this contract was 15 April 2008, and no extensions were authorized by the

19

Government. On 1 April 2008, Mr. Marc Morales of Allied Defense Group (AEY's supplier of the 5.56mm rounds) sent the contracting specialist (Erwin Fernandez) an unsolicited email stating his concerns about AEY's financial stability. Mr. Morales also stated, "Please be aware that the Allied Defense Group is delivering as scheduled according to our contract with AEY, Inc. We received a contract after the fact and were not made aware of the delivery schedule promised by AEY. As a matter of fact we have accelerated the original delivery schedule promised to AEY as we were told that you needed the ammunition sooner than originally anticipated." Further, "As a side note, per our contract with AEY, we are planning to deliver to AEY (ex-works) the 39,000,000 rounds per the schedule below: 13M by April 14th, 13M by May 31st—maybe earlier, 13M by July 31st—probably the week before." This email from the vendor caused the Government serious concern, as it contradicted the information coming from AEY. In sum, AEY's after-the-fact contract with its vendor never met the delivery requirements; and AEY's assurances about the mode and status of delivery were wrong at best, and very possibly intentionally misleading. In his email sent April 5, 2008, to AEYs counsel, Mr. Marko Cerenko, and to Mr. Diveroli, the contracting specialist (Erwin Fernandez) informed AEY that "the Government will require strict compliance with the contractual delivery date." When shipment of cargo failed to occur according to the contractual period of performance, the undersigned terminated the contract for cause on 17 April 2008. The Contract [sic] Officer determined that AEY's professed reasons for delay were not supported by the facts, lacked credibility, and did not constitute excusable delays.

(R4, tab 20 at 1-3) The final decision contains a number of factual errors which were brought out during LTC McColumn's testimony but we do not need to address them for purposes of this decision.

47. LTC McColumn's final decision asserts that "commercial cargo airlines know that fuel is generally not available in Baghdad for commercial flights and therefore arrange to load aircraft appropriately to be able to return to an airport that sells fuel." This assertion appears to have its basis in information that the government received from SkyLink via a series of emails in early April 2008. The emails began with AEY asking SkyLink on 2 April 2008 for assistance in acquiring fuel so as to be able to begin deliveries on Contract M-0815 (R4, tab 14 at 10). SkyLink responded, "at this time there is no fuel for cargo aircraft due to low fuel levels" (id. at 6). AEY forwarded this

20

response to Mr. Fernandez and requested assistance in acquiring fuel from the military side of the airport, noting that AEY could deliver up to 1,977,000 rounds of ammunition with 20 metric tons of fuel (*id.*). Mr. Fernandez forwarded this information on to LTJG Page of MNSTC-I, who forwarded it to COL Morrison (*id.* at 4). COL Morrison then contacted a Mr. Jack Holly in what appears to be the government fuel contracting office, asking:

> I am trying to get ground truth on a fuel issue at BIAP. AEY is scheduled to deliver 25M rounds of 7.62x54 ammo—13 flights by A/C IL-76. AEY states that the reason they cannot deliver is the lack of fuel available on the commercial side of BIAP. Skylink (see email trail below) states there is a shortage. Does this track with what you know and if so do you have a timeline when they may get fuel so we can coordinate this delivery of ammo?

(R4, tab 14 at 4) Mr. Holly responded on 3 April 2008, in relevant part:

> Skylink is the DFC subcontractor for fuels for DOD agencies as a priority. Commercial refueling is not allowed by the DFC contract. All commercial air cargo vendors has [sic] known this and as such have had to load aircraft appropriately to be able to return to an airport that holds fuel. Reduced capacity for each aircraft and increased Aircraft total numbers has been the ongoing method of compliance. I think that AEY may be using this to save money or to delay by not increasing aircraft numbers or having the Aircraft divert to an intermediate refueling airport enroute.

(*Id.* at 3) The next day, SkyLink emailed Mr. Holly, stating:

> Just to clarify on this we have been either at limited or no issue fuel on cargo flights on and off for the past 3 months and most operators are able to get around this with return fuel loads and certainly there has never been an instance that we are aware of an inability to deliver cargo.
>
> We are receiving quantity fuel now and hope to start cargo issues within the next 2 days and we are also working on a longer term strategic plan utilizing fuel from Baji refinery which I will brief you on fully on my return as this is close hold at the minute.

21

(R4, tab 14 at 2) Mr. Holly forwarded SkyLink's email on to COL Morrison (*id.*). COL Morrison forwarded this email on 5 April 2008 to the contracting office (JCCI) and LTC McColumn, stating:

> FYI... more info ref the fuel issue and AEY...as far as I am concerned I expect AEY to deliver as per the contract...was told 15 April??? Can you confirm the date please? Also if they don't deliver on time I want to CXL and then contract with someone else...there is way to [sic] much bad baggage with AEY. I can not get strung along on promises of deliveries, or excuse after excuse on why the[y] can not deliver. This 25M rounds [of] 7.62 ammo is critical especially with the ongoing Basrah operation...need your assist to help us out.

To this, LTC McColumn replied, "We are on the same sheet sir." (R4, tab 14 at 1-2)

*The Saga Continues: Contract M-0670*

48. LTC McColumn did not terminate Contract M-0670 on 17 April 2008. At trial he testified he did not remember the reason, but speculated it may have been because the government had not decided what to do about the partial delivery of AK-47s under that contract (tr. 4/60).[12] All of the line items called for under Contract M-0670 were ultimately delivered by AEY and accepted by the government, with the exception of (1) one universal laser bore sight out of the 20 called for by CLIN 0001; (2) the remaining AK-47s under CLIN 0004AA (1,300 repackaged rifles were accepted); and (3) the DShK machine guns under CLIN 0006AA. (Findings 10-16)

49. At some time prior to 6 May 2008, SSgt Margarita Matson succeeded LTC McColumn as CO for Contract M-0670. In an email dated 6 May 2008, she sought verification from the customer (MNSTC-I/J4) that the remaining AK-47s on contract M-0670 were no longer needed (R4, tab 367). First Lieutenant Kirsten Bethancourt replied: "Yes, you are correct—we do not need the remaining AK-47s on the 0670 contract" (*id.*). On 12 May 2008, CO Matson directed AEY not to ship the remaining items on Contract M-0670, including the AK-47s, and to "cease all work immediately," adding that the government intended to terminate the remainder of the contract (R4, tab 119).

50. On 31 May 2008, LTC McColumn emailed COL Cain at AGW, authorizing him to accept the M-0670 shipments, "including the AK-47s" (R4, tab 278 at 5). In

---

[12] LTC McColumn drafted a memorandum for record on 24 April 2008 containing a rationale for terminating all CLINs in Contract M-0670 except for CLIN 0004AA, under which the partial delivery of AK-47s took place (R4, tab 111).

response, Marsha Havemann at AGW asked whether "the AK-47s that have NOT been reworked by AEY are to be included as Accepted" (*id.* at 3). CO Matson responded:

> You have been cleared to accept the shipment but the ball is in your court to confirm the acceptability of the items. I would suggest not accepting the AK-47s that have not been reworked by Skylink. Once acceptance on these items has occurred, the contractor is no longer held liable for those items.

(*Id.*) Ms. Havemann responded that she agreed and that she would contact AEY "to determine when they want the rest to be reworked" (*id.* at 2). On 2 June 2008 she emailed AEY to inform them that only 1,300 AK-47s had been accepted and that 2805 still needed to be "reworked" (*id.* at 1-2).

51. AEY was surprised by this because COL Cain had told Mr. Diveroli that only 1,300 rifles needed to be repackaged, and SkyLink had also been told by authorities at AGW that "there were only 130 crates that needed attention" (finding 14; tr. 3/27-28). Mr. Diveroli's view was that the rifles met the contract specifications without needing to be repackaged (tr. 3/35). Nevertheless, AEY approached SkyLink to ascertain its availability to repackage the remaining 2,805 rifles and entered into another service agreement on 16 June 2008 that expired 30 June 2008 (R4, tab 320). On 18 June 2008, Mr. Diveroli contacted SkyLink inquiring about the schedule for picking up the remaining rifles from AGW and was informed that SkyLink was waiting to hear back from COL Cain at AGW on a date they could come and pick up the rifles (tr. 3/37; R4, tab 321).

52. At some point, AEY heard from COL Cain that the weapons could be made available by 5 July 2008, and AEY informed CO Matson of this (R4, tab 126 at 1). However, on 1 July 2008, SkyLink informed COL Cain that it could no longer support the project due to the press of other work (R4, tab 324). At this point, AEY contacted CO Matson to ascertain whether she would be willing to accept the rifles "as is" in return for a discount of $20 per rifle that would lower the price per rifle to $79.98 (tr. 3/47; R4, tab 131). CO Matson rejected this offer and proposed terminating the remainder of the contract, including the 2,805 delivered rifles, for convenience at no cost to the government (R4, tab 132).

53. Although Ms. Havemann, the government quality assurance specialist at AGW, ultimately elected not to accept the remaining 2,805 rifles, there is no evidence that there was anything wrong with them. Her inquiry as to whether they should be accepted did not indicate anything other than they had not been "reworked" as had the 1,300 rifles repackaged by SkyLink (finding 50). CO Matson's response suggesting that they should not be accepted without being "reworked" by SkyLink, merely assumes that such "reworking," which consisted of repackaging, was needed (*id.*).

54. The original report of discrepancy issued after the shipment was delivered on 29 January 2008 did not specify how many AK-47 crates were missing interior partitions, although it seemed to say that "most" of them did (finding 12). But when SkyLink went to AGW to pick up the crates that needed to be repackaged, it was told by AGW personnel that only 130 crates (1,300 rifles) needed attention (finding 14). CO Matson stated, in rejecting AEY's offer of a $20 discount per rifle, that the government could not accept "items that are not ready for use," but no factual basis for this characterization appears in the record. To the contrary, Mr. Diveroli testified, supported by photographs of the rifles, that the weapons were in good condition. (Tr. 2/23, 26; R4, tab 341) We find the record to be devoid of any evidence that the remaining 2,805 AK-47s were nonconforming or needed to be repackaged; indeed, the weight of the evidence is to the contrary.

55. AEY informed CO Matson on 7 July 2008 that it could not accept her proposal for a no-cost termination for convenience of Contract M-0670, because it would cause a significant financial loss for the company (R4, tab 325 at 2). Instead, it informed the CO that it had found another company able to complete the repackaging work within 5-10 days of picking up the weapons (id.). At this point, it was only two days after COL Cain had indicated the weapons would be made available. However, the next day CO Matson instructed AEY to stop all work on the AK-47s, stating that AEY was "given more than enough time to have [the rifles] reworked and we will not give you anymore time" (R4, tab 134). She also delivered an ultimatum:

> You can either accept our proposal from 7 July 08 and take a no cost termination for convenience or we can terminate the remainder of the contract that has not been accepted to include the RPKs for cause.

(Id.)

56. Mr. Diveroli testified that this was, in his view, most unfair because he believed that there was no reason that the weapons could not have been accepted once he supplied the missing accessories (tr. 3/54). He never saw a contract requirement to pack the weapons a certain way (id.). He had delivered weapons in 2005 that were not necessarily packed 10 weapons to a crate with partitions, but had been accepted by the same office (tr. 3/48). The AK-47s were not a "high margin item" and he had already spent $35,000 with SkyLink for work on 1,300 rifles that in his view added nothing to the performance or operational value of the weapons, just to make the government happy (tr. 3/53-55). Moreover, AEY had already paid its supplier for the 25,895 AK-47s that were yet to be delivered but were awaiting export licenses, meaning losses in the millions of dollars (tr. 3/55).

57. The very next day, 9 July 2008, AEY asked that CO Matson reconsider her stated intention to terminate Contract M-0670 for cause, pointing out that the Army had failed to make the AK-47s available for pick-up until 5 July 2008 (R4, tab 135). On

19 July 2008, CO Matson issued a final decision terminating the contract with respect to unacceptable and/or undelivered CLINs, excluding the RPKs and all other accepted items (R4, tab 329). CO Matson's final decision stated, in relevant part:

> A Report of Discrepancy (ROD) was issued stating all of the AK47s delivered were not properly stored and missing parts. You were afforded the opportunity to correct the situation. You made an agreement with SkyLink Arabia to rework 118 boxes (1,300) weapons on 19 March 08. Once reworked and reinspected by government personnel, those weapons were accepted. Another opportunity was afforded to correct the remaining weapons with the understanding that your failure to do so may result in a termination. You made an agreement with SkyLink Arabia to rework the remaining 2,805 AK47s on 16 June 08. SkyLink Arabia notified the U.S. Government on 1 July 08 of agreement cancellation stating that they were unable to support your efforts.
>
> You were given ample opportunities to correct the deficiencies stated in the ROD regarding the AK47s. The plan of action provided by your company to remedy the situation was unsuccessful and the weapons remain unacceptable.
>
> To date, CLINs 0001 (partial), 0004AA (partial), 0006AA, 0008AA (Shipping) and 0008AB (partial shipping) have not been delivered. The above referenced CLIN[s] to include the unacceptable AK47s in CLIN 0004AA will be terminated for cause for your failure to deliver in accordance with the terms and conditions set forth in the contract and your inability to provide reasonable assurance of delivery in the near future.

(*Id.*)[13] CO Matson never issued a cure notice calling for AEY to submit assurances of future performance.

58. On 15 July 2008, AEY timely appealed to the Board LTC McColumn's final decision terminating Contracts M-0815, M-0010, M-0040, and C-0005 for cause in full or in part. The appeals were docketed on 16 July 2008 as, respectively, ASBCA Nos. 56470, 56471, 56472, and 56473. On 15 October 2008, AEY timely appealed to the Board CO Matson's final decision partially terminating Contract M-0670 for cause. This appeal was docketed on 16 October 2008 as ASBCA No. 56591. The appeals were

---

[13] The termination of CLIN 0001 as to one laser bore sight that either was not delivered or was found unacceptable is not contested by AEY.

voluntarily dismissed without prejudice in 2008 and were reinstated in 2010. In 2012, the appeals were consolidated for hearing and decision. After a somewhat lengthy procedural history, a hearing was held, commencing 30 November 2015. The government elected to present its case on the written record under Board Rule 11 and only appellant called witnesses to testify at the hearing.

## DISCUSSION

As a preliminary matter, AEY contends that the military grade arms and accessories being procured under the five contracts do not qualify as commercial items and that, as a result, the Contract Terms and Conditions—Commercial Items clause, FAR 52.212-4, was the wrong clause to be included in the contracts. Rather, AEY argues that FAR 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE), must be incorporated into the contracts pursuant to the holding of *G.L. Christian & Associates v. United States*, 312 F.2d 418 (Ct. Cl. 1963). (App. br. at 41-47) The government vigorously disagrees (gov't reply at 3-5). We find it unnecessary to decide this issue in order to dispose of the appeals.

A termination for default is a drastic sanction that should be imposed only for good grounds and on solid evidence. *J.D. Hedin Construction Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969). The government bears the burden of proving that the termination was justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). If the government establishes a prima facie case of the contractor's default, then the contractor bears the burden to show that its default was excusable or was caused by the government's material breach. *Military Aircraft Parts*, ASBCA No. 59978, 15-1 BCA ¶ 36,101 at 176,256. These principles apply equally in the case of a termination for cause under FAR 52.212-4(m). *Genome-Communications*, ASBCA Nos. 57267, 57285, 11-1 BCA ¶ 34,699 at 170,844.

Under FAR 52.212-4(m), the government may terminate a contract for cause "in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance." LTC McColumn terminated Contracts M-0815, M-0010, M-0040, and C-0005 based on AEY's failure to deliver by the contract due date (finding 46). CO Matson terminated CLINs 0001 (as to one of 20 laser bore sights), 0004AA (all but the 1,300 delivered and accepted AK-47s), 0006AA (287 DShKs), 0008AA and 0008AB (shipping) of Contract M-0670 due to "failure to deliver within the terms and conditions of the contract and to provide adequate assurance of delivery" (R4, tab 138).

*Severability*

In deciding the particulars of whether AEY failed to deliver by the contract due date, we must decide what the contract due dates were for each CLIN under each of the

26

five contracts. In this respect we have determined, following the lead of our decision in *Bulova Technologies Ordnance Systems LLC*, ASBCA No. 57406, 14-1 BCA ¶ 35,521 at 174,098-99, that the three contracts containing multiple deliverables were severable. Severability simply means that the entire contract cannot be terminated for default for failure to deliver one or more line items by the due date. Per *Bulova*, the factors to be considered in this analysis include whether the items are capable of being performed separately, and whether the parties' conduct suggests that the requirements are "separate in character." *Id.* at 174,099. As in *Bulova*, the contracts in these appeals procured weapons for distinct end users, the Iraq Ministry of Defense (military), the Iraq Ministry of Foreign Affairs, and the Iraq Ministry of Interior (police) (finding 2). The weapons to be procured were distinct, with no interdependence, and were manufactured or stockpiled by different entities in different countries (findings 4, 6, 9). Each item carried its own pricing and contract due date based on the receipt of an acceptable EUC directed to the country from which it was sourced (*id.*; R4, tabs 1, 8, 24). The parties' conduct during performance was consistent with the contract structure.

*Contract Due Dates*

Having found the contracts with multiple CLINs to be severable, our next task is to determine the contract due dates. The original contract due dates are set out in findings 4-9 above. One of the issues presented in these appeals is whether the original contract due dates were revised in the 3 April 2008 conference call with LTC McColumn. The record contains conflicting evidence on whether 15 April 2008 was a revised delivery date for all or part of the items to be delivered under the five contracts, or merely a date by which AEY needed to show "some sign of delivery." On the one hand, Mr. Fernandez's memorandum to file of the 3 April 2008 telephone call stated, "Made Ktr aware to show the government some sign of delivery by 15 Apr 08." (Finding 30) This is consistent with Mr. Diveroli's recollection of the conversation. On the other hand, LTC McColumn's final decision states variously that 15 April 2008 was a date by which "at least partial delivery" was required (for Contracts M-0815, M-0010, and M-0040) or was the revised contractual due date or "period of performance" (Contract C-0005) (finding 46).[14]

In a memorandum to file dated 13 May 2008, in which LTC McColumn documents his rationale for terminating Contracts M-0815, M-0010, M-0040, and C-0005 for cause, he states that in the 3 April 2008 conference call he told AEY that at least partial delivery would be required by 15 April 2008 (R4, tab 21). LTC McColumn

---

[14] The final decision also states that AEY established a revised schedule under Contract M-0815 through an email from Mr. Diveroli reporting that AEY "should be able to begin shipping" on 11 April 2008. The Board views the cited document (R4, tab 261) as a hopeful status report and not a "revised schedule (*See also* tr. 2/112-13)

stated in a 5 April 2008 internal email to his superior, COL Mark Morrison, MNSTC-I/J4, his belief that he had set a revised delivery date of 15 April 2008, at least on Contract M-0815:

> Roger sir, 15 April is the date. I am "intimately" engaged with AEY to ensure they understand the need for on-time delivery IAW the "renegotiated" delivery schedule. I have informed them of the actions I will have to take should they fail to deliver.

(R4, tab 14 at 1) However, there is nothing in the record indicating that this version of events was ever communicated to AEY, in the 3 April 2008 conference call or at any time prior to the terminations, much less that there was agreement on a "renegotiated" delivery date.[15] Indeed, LTC McColumn testified at the hearing in this case that in the 3 April 2008 telephone conversation with AEY he did not set a revised delivery date for any of AEY's contracts but asked for "some sign of delivery" by 15 April 2008 (tr. 4/47). Thus, while LTC McColumn may have believed at the time that his "benevolence" in requiring "some sign of delivery" by 15 April 2008 was equivalent to setting a revised delivery date of 15 April 2008 or requiring partial deliveries on the contract by that date, we find that the government did not establish a revised schedule or new delivery dates for any of the five contracts.

*Termination of CLINs that Were Not Yet Due*

There is no dispute that LTC McColumn, on 17 April 2008, terminated CLINs that were not yet due under Contracts M-0010 and M-0040. Under Contract M-0010, CLINs 0007, 0008, and 0009 (small arms repair kit, 60 sniper rifles, and 60 spotter scopes from the U.S.) were due on 28 April 2008. Under Contract M-0040, various items under CLINs 0006-7, 0009-12, 0014-21, and 0026-27 (all from the U.S.) were due on 21 April 2008, and CLIN 0022 (submachine guns from Pakistan) was also due on 21 April 2008.

AEY contends, and the government concedes, that in the absence of a cure notice for failure to make progress, the government's termination of CLINs that were not yet due under the contracts was improper (gov't br. at 25). The Board agrees. The termination for cause of the above-enumerated CLINs under Contracts M-0010 and M-0040 is hereby converted to a termination for convenience.

---

[15] LTC McColumn actually did not speak to AEY from the time of the 3 April conference call until 17 April 2008 when he issued the terminations (tr. 3/159).

*Did the Government Waive Original Contract Due Dates for Any of the Deliverables?*

The original contract due date on Contract C-0005 was 7 April 2008 (finding 8). AEY contends that CO Goff agreed to a "final delivery schedule" on Contract C-0005 consisting of three installments of ammunition to be shipped from the U.S. on 14 April 2008, 31 May 2008, and 31 July 2008 (app. br. at 51). In the alternative, AEY argues that CO Goff expressly waived the original contract delivery date by acquiescing in an installment schedule that extended far beyond the contractual due date of 7 April 2008, and by requesting the latest updated delivery schedule prior to his departure for the purpose of modifying the contract (app. br. at 68-69). The government denies that waiver occurred and asserts that, at most, CO Goff agreed to an installment contract and there is no evidence that he agreed to modify the first delivery date of 7 April 2008, which AEY missed (gov't br. at 21).

AEY also contends that the government waived the original delivery date of 27 December 2007 on Contract M-0815 by allowing AEY to continue performance for several months to its detriment before terminating, without ever establishing a new delivery date (app. br. at 66, 69-70). The government concedes that the original delivery date was probably waived (gov't br. at 18), but argues that LTC McColumn re-established a delivery date of 15 April 2008 to which AEY acquiesced following the 3 April conference call (gov't br. at 18-19).

AEY has the burden to prove the affirmative defense of waiver of the contract delivery schedule. To prove waiver, a contractor must show (1) failure to terminate within a reasonable time after default under circumstances indicating forbearance; and (2) reliance by the contractor on the failure to terminate and continued performance under the contract, with the government's knowledge and implied or express consent. *DayDanyon Corporation*, ASBCA No. 57681, 15-1 BCA ¶ 36,073 at 176,152 (citing *DeVito v. United States*, 413 F.2d 1147, 1153-54 (Ct. Cl. 1969)). In *Tectron Corp.*, ASBCA No. 12901 *et al.*, 73-1 BCA ¶ 9786, we elaborated on these elements:

> After failure of delivery without excusable cause, the Government must make an election of remedies; i.e., to terminate the contract for default or to waive the delivery date and require continued performance. The time within which this election is made must be reasonable and often it is difficult to determine whether the Government is forbearing a termination for default to assess the situation or whether it is forbearing to continue the contract. The determination usually rests on whether the Government's acts are non-affirmative in nature, indicating forbearance of termination, or affirmative, indicating an election and waiver of the delivery schedule....

29

As the Board has held in previous cases, waiver of the delivery schedule by acts or conduct of Government representatives ordinarily requires at least two basic elements, (1) conduct on the part of the Government which is reasonably believed by the delinquent contractor to constitute encouragement to proceed with performance of the contract after the delivery date has passed, and (2) incurrence of performance costs by the delinquent contractor in reliance thereon.

*Id.* at 45,719.

Bearing these principles in mind, we first examine Contract C-0005. Mr. Diveroli testified, without contradiction, that prior to contract award he was approached by Mark Morales of Allied Defense Group and asked if he would consider sourcing the ammunition with Allied's affiliate ATK. He then broached the possibility to CO Goff, explaining that ATK would have to manufacture the ammunition and that it would be shipped by sea from the U.S., and that therefore the entire 39 million rounds would take longer to deliver than ammunition already stockpiled in Europe that could be delivered by air. He further testified that CO Goff, after checking with the customer, gave him the green light to order the ammunition from the U.S. In reliance on CO Goff's assent, AEY placed the order with MECAR on 7 December 2007, one day prior to award of Contract C-0005. The delivery dates[16] in the order to MECAR were: 3 million rounds on 28 February 2008, 7 million rounds on 1 April 2008, 7 million rounds on 30 April 2008, 7 million rounds on 31 May 2008, 7 million rounds on 30 June 2008, and 8 million rounds on 31 July 2008. (Findings 7-8)

Late in December 2007, AEY reported to CO Goff that it hoped to have firm delivery dates "soon" (finding 23). In February 2008, MECAR informed AEY that the contract dates would slip by roughly a month and proposed to deliver 13 million rounds during the period 25 March to 5 April 2008, 13 million rounds 25 May to 5 June 2008, and 13 million rounds 25 July to 5 August 2008. Later in February MECAR pushed back the expected first delivery date to 14 April 2008, a week past the contract delivery date of 7 April 2008. (*Id.*) AEY updated CO Goff on the expected shipping dates for the ammunition on a regular basis, and on 30 March 2008 notified CO Goff that the first 13 million rounds were being packaged and prepared for ocean shipment (*id.*). It is apparent that CO Goff was aware through this process that the delivery date of 7 April 2008 contained in the express terms of the contract would not be met, not even for the first installment of 13 million rounds. Indeed, while CO Goff indicated he would try to modify the contract to reflect the new delivery dates before he was reassigned at the end

---

[16] The Board infers that these dates signified date of delivery to AEY in the U.S., not delivery to the customer in Baghdad. The contemplated shipment by sea would add additional time before final delivery to the customer.

of March, he failed to do so and the record does not reflect that before his departure he ever received firm dates that the ammunition would be delivered in Baghdad. Thus, we do not find that there was agreement on a revised delivery schedule. We do find that the government, through CO Goff, affirmatively waived the original contract delivery date.

But what of the government's argument that the original waiver consisted, at most, of agreement to an installment contract with the first delivery due no later than the contract's express due date of 7 April 2008? As originally contemplated, the first installment would have been delivered to AEY for ocean shipment in February of 2008, so it is possible that CO Goff originally expected to receive the first shipment by 7 April 2008. However, the expected delivery date for the first installment was pushed back by MECAR in February to the end of March/beginning of April, and then to 14 April 2008. CO Goff was kept informed of these changes by AEY, and the government took no action that would indicate that it thought it had a firm delivery date no later than 7 April 2008. To the contrary, before his departure at the end of March 2008, CO Goff merely asked AEY to provide an update on the expected shipping schedule, and was at that time informed that the first 13 million rounds were being packaged for ocean shipment. Thus, we find that even if the government thought it was agreeing originally to an installment contract (and there is nothing in the record that affirmatively indicates such an understanding), its knowledge and acquiescence in February and March 2008 to a first delivery after the 7 April 2008 due date in the contract sealed its waiver of that contract due date, even for the first installment.

Our conclusion that the contract delivery date was waived is not affected by the fact that the successor CO, LTC McColumn, did not recognize that a waiver had occurred. LTC McColumn was asked during his testimony if he agreed that the government is required to establish a new, reasonable delivery date if it waives the original contract delivery date. His answer was that "[t]he reasonable date was the date of delivery [in the contract]" and that "[a]nything after the performance period of the contract was truly benevolence." (Tr. 4/39-40) LTC McColumn also expressed the view that perhaps the CO had not terminated AEY's contracts when it should have based on the passing of contract delivery dates without deliveries, but that the contract delivery dates were unchanged (tr. 4/95). But once a waiver has occurred, it is not undone by a successor CO's failure to realize it has occurred. Rather, the government must establish a new, reasonable delivery date by written notice to the contractor. *DeVito*, 413 F.2d at 1154. LTC McColumn did not establish new, reasonable delivery dates for any of the contracts.

The Board further finds that AEY relied on the government's waiver to its detriment. In reliance on the government's assent to the more expensive U.S. ammunition and slower shipment by sea, AEY lost the opportunity to buy less expensive ammunition that met the contract specifications—and most likely could have been delivered by air by the original due date—from European suppliers. (Finding 7) Moreover, as part of its effort to show LTC McColumn "some sign of delivery" by

31

15 April 2008, AEY arranged for more expensive air shipment instead of shipment by sea, and paid MECAR the amount of $3,845,800 on 18 April 2008 to release the first shipment of 13 million rounds of ammunition from the United States. (Findings 42-43)

Because the original delivery date was waived, the government's 17 April 2008 termination of Contract C-0005 for cause was improper, and it is hereby converted to a termination for convenience.

We now turn to Contract M-0815. Delivery of ammunition under this contract was due 27 December 2007 (finding 5). An export license from the Czech Republic was not issued until well after this date, on 21 January 2008. Following issuance of the license, AEY entered into an aircraft charter with Galaxy Air and reported to CO Goff that AEY planned to commence shipping by mid-February. (Finding 17) It took AEY some time to line up the necessary permits, and on 10 February 2008 AEY reported to CO Goff that operations would commence on 26 February and continue into mid-March (finding 18). The fuel shortage in Baghdad then prevented flights from commencing as scheduled. AEY contacted numerous carriers but none had a solution to the problem until April at the earliest. CO Goff was kept apprised of AEY's efforts in the face of the fuel shortage. (Finding 19)

Notably, no effort was made by the government during this period to enforce the original contract due date, and it was apparently not until 30 March 2008 that the government communicated to AEY that the ammunition was urgently needed (finding 28). Despite the urgent need, and the government's awareness that the cargo was waiting in a warehouse at PED ready to be shipped if a solution to the fuel issue could be found, the government also failed to respond to AEY's request for assistance with respect to the fuel issue, including its request for permission to land on the military side of the airport to refuel after deliveries. (Finding 29)

The email exchange recounted in finding 47 corroborates the fact of a fuel shortage in Baghdad, and also demonstrates that, by 5 April 2008, the government had reason to believe that AEY could have begun deliveries during the fuel shortage, although at greater expense due to the reduced cargo loads and/or the need to refuel at intermediate airports.

However, we need not decide if the fuel shortage excused AEY's delays in delivery despite the possible availability of a more expensive workaround because we find that the original contract due date of 27 December 2007 was waived by the government well prior to the end of March 2008, and the government did not establish a new date for delivery. AEY relied on the government's waiver. It had already paid for the ammunition and was paying rent each month on the airport warehouse at which the ammunition was stored, in addition to continuing to seek out carriers and assist them with overflight and landing permits, through the date of termination (17 April 2008). (Findings 33-35, 28, n.9) AEY also paid its carrier, JLM, $110,000 on 14 April 2008 for

a series of deliveries that were to begin with a positioning flight into PED on 14 April 2008 (finding 35).

The termination for cause of Contract M-0815 was therefore improper and is converted to a termination for convenience.

AEY further contends that delivery dates on the remaining three contracts were waived by the government. As for Contract M-0040, the contract due dates were 7 April 2008 for CLINs 0002, 0008, and 0013 (AK-47s and machine guns to be acquired from Serbia); 21 April 2008 for CLIN 0022 (submachine guns to be acquired from Pakistan); and 21 April for all other CLINs (to be acquired from the United States).[17] AEY contends that the government waived the 7 April 2008 due date because on 7 April 2008 AEY paid a supplier the balance due for spotter scopes sourced in the U.S. (App. br. at 67) However, the 7 April 2008 due date was for items from Serbia, and we have been pointed to no conduct on the part of the government that we consider to be sufficient to show a waiver of that due date. We conclude that AEY has not met its burden of proof to show that the government waived the 7 April 2008 due date on Contract M-0040 for CLINs 0002, 0008, and 0013.

As for Contract M-0010, the contract delivery date was 7 April 2008 for CLINs 0001, 0003, 0005, 0006, and 0010, to be acquired from Serbia, and for CLIN 0004, to be acquired from the Czech Republic. For all other CLINs under the contract, to be acquired from the U.S., the due date was 28 April 2008.[18] AEY's argument for waiver of the 7 April 2008 due date is again based on its payment for the U.S. spotter scopes (app. br. at 67). However, as with Contract M-0040, we find that AEY has not met its burden of proof to show waiver of the 7 April 2008 due date.

As for Contract M-0670, the government ultimately accepted all line items under this contract other than (1) the AK-47s, CLIN 0004AA, and (2) the DShK machine guns, CLIN 0006AA. The original contract delivery date for the 16,000 AK-47s coming from Montenegro was 29 November 2007 (finding 4). Of these, 4,105 were delivered to the government on 29 January 2008, following Montenegro's issuance of a partial export license on 25 December 2007 (finding 11). From the date of the partial shipment in January through May of 2008, although LTC McColumn wanted "some sign of delivery" on at least one contract by 15 April, we see no evidence that the government expressed any concern regarding the AK-47s that had not yet shipped. The government's lack of concern may be due to the fact that as of 6 May 2008, and possibly before, the end user no longer had a need for the AK-47s. On 12 May 2008, the government directed AEY

---

[17] We have already found the 17 April 2008 termination for cause to be improper as to the items due thereafter on 21 April 2008.

[18] We have previously found that the 17 April 2008 termination for cause was improper as to the items due thereafter on 28 April 2008.

not to ship the remaining AK-47s and to "cease all work immediately," adding that the government intended to terminate the remainder of the contract (finding 49).[19]

We consider the fact that the government took no action to issue a show cause notice or to terminate with respect to the remaining 11,895 Montenegro AK-47s after AEY delivered 4,105 of them in January 2008 (two months after the contract due date). Indeed, on 5 May 2008 the government accepted an April shipment of missing parts and accessories for the AK-47s that were delivered in January 2008 (R4, tab 93 at 4, tab 315; tr. 2/202). Other shipments under M-0670 were also accepted in April 2008 (finding 10). We also consider LTC McColumn's decision not to terminate CLIN 0004AA or any other CLIN of Contract M-0670 in April 2008 and his 31 May 2008 authorization to AGW to accept the AK-47s and all the April deliveries under Contract M-0670 (R4, tab 278 at 5). We further think it relevant that CO Matson, on 12 May 2008, issued a stop-work order, directed that the remaining AK-47s not be delivered, and shortly thereafter proposed that the remaining quantities of AK-47s be terminated for convenience at no cost to the government. This affirmative conduct, and the period of time over which it occurred, are not consistent with forbearance for the purpose of assessing whether a termination for cause is justified. Rather, the government's conduct is consistent with an election to waive the contract delivery date. Therefore, we find that AEY has established the first element of waiver with respect to the remaining 11,895 AK-47s from Montenegro due under CLIN 0004AA of Contract M-0670.

The second element of waiver that AEY must show by a preponderance of the evidence is detrimental reliance on the government's conduct. We think this element is established by the extra effort and expense that AEY expended to repackage the initial quantity of 1,300 rifles and AEY's attempts to arrange for the repackaging of the rest of the delivered rifles after the government's belated decision to require them to be repackaged. These latter efforts continued until CO Matson refused to permit AEY to do the rest of the re-packaging with a company other than SkyLink and issued a stop-work order on 8 July 2008 (finding 55).

Thus, we find that the government waived the original contract delivery date for the remaining 11,895 AK-47s from Montenegro due under CLIN 0004AA of Contract M-0670. We note that even if it had not, AEY's failure to deliver might have been excusable, since it apparently was still awaiting a Montenegro export license for the remaining quantity at the time CO Matson issued a stop-work/do not ship order on 12 May 2008 (findings 48, 11 n.5), and thereafter was prevented from performing by the government's stop-work order.

---

[19] The 14,000 AK-47s coming from Croatia were not due until 19 May 2008 (finding 4), a week after the direction not to ship and to stop work, so we do not consider them here.

34

The 287 DShK machine guns sourced from the Czech Republic under CLIN 0006AA of Contract M-0670 were due on 14 April 2008 (finding 4). Given the relatively short period of time (less than a month) between the due date and CO Matson's stop-work order on 12 May 2008, the evidence is insufficient to support a finding of waiver.

*Has AEY Proven Excusable Delay for Any of the Contract CLINs?*

On Contract M-0670, the express due date for CLIN 0006AA for 287 DShK machine guns from the Czech Republic was 14 April 2008. It is undisputed that the DShKs were not delivered by 14 April 2008. Therefore, the government has established a prima facie case of default with respect to CLIN 0006AA of Contract M-0670. We consider whether AEY has met its burden of proving excusable delay. The record contains Mr. Diveroli's testimony that, as of 24 April 2008, AEY was still awaiting an export license from the Czech Republic for the DShKs (tr. 2/216). The government contends that a country's delay in issuing an export license cannot constitute excusable delay but is merely "prevailing conditions in the international arms business" as to which AEY assumed the risk under its contracts (gov't reply at 7). We do not agree. The FAR clause provides that a contractor is not liable for default if its nonperformance is "caused by an occurrence beyond the reasonable control of" and without the fault or negligence of the contractor (finding 3). The government does not argue that the issuance or non-issuance of an export license was within AEY's reasonable control, other than to posit that perhaps it should have chosen to do business with suppliers in a country with more predictable timelines. Tellingly, the government has pointed to no evidence that any of the delays in issuing export licenses in these appeals resulted from any fault or negligence of AEY or that the arms and ammunition in question were available from countries with "more predictable timelines." Thus, on the record before us, we hold that AEY's non-delivery on the subject contracts due to the lack of a necessary export license constitutes excusable delay for as long as the situation is shown to persist.

Nor do we agree with the government that the contracts placed the risk on AEY of a sovereign nation's delay in issuing an export license. The contract clause cited by the government to support this proposition states:

> Contractor shall process all necessary licenses, approvals, and/or certificates required from the U.S. or another Nation as it may be applicable to ensure world arms sales ability and to perform the work/deliveries.

The plain meaning of this clause, which appears in four of the contracts and not in Contract M-0815, is that the contractor shall be diligent in expediting those matters that are within its control. A clause placing the risk on the contractor of acts solely within the control of a foreign nation would clearly (or should clearly) say so. We doubt that the government would find many takers or reasonable prices if it clearly placed on the contractor the risk of an event completely beyond its control.

35

The government issued the stop-work/do not ship order under Contract M-0670 on 12 May 2008 (finding 49). However, AEY has not pointed to any evidence that AEY was still awaiting the export license beyond 24 April 2008. The burden to prove excusable delays is on the appellant. In this instance, it has not been met. Thus, we uphold the government's termination for cause of CLIN 0006AA of Contract M-0670.

On Contract M-0010, the express due date for CLINs 0001, 0003, 0005, 0006, and 0010 (various arms from Serbia) was 7 April 2008. The due date for CLIN 0004, DShK machine guns from the Czech Republic, was also 7 April 2008. AEY has not met its burden to demonstrate waiver of these due dates by the government. It is undisputed that the various items under these CLINs were not delivered by 7 April 2008. Therefore, the government has established a prima facie case of default with respect to the above-enumerated CLINs of Contract M-0010.

However, AEY has established that its non-delivery of these six CLINs was caused by the fact that it had not received export licenses from either Serbia or the Czech Republic for the items, and there is no evidence in the record that the delay was due to any fault or negligence of AEY. It reported to the government on 12 April 2008 that it was still awaiting both the Czech and Serbian licenses and anticipated receiving them by 2 May 2008 (finding 21). Nevertheless, LTC McColumn terminated these six CLINs for cause on 17 April 2008 (finding 46). The termination for cause was improper because the delay was excusable. It is hereby converted into a termination for convenience.

Remaining Contract M-0670 CLINs

CO Matson on 19 July 2008 also terminated 2,805 AK-47s delivered by AEY under CLIN 0004AA of Contract M-0670 and the undelivered 14,000 AK-47s from Croatia that were not due until 19 May 2008, seven days after CO Matson issued the stop-work/do not ship order.

As to the 2,805 delivered AK-47s, the government has not met its burden to prove a prima facie case of default. The record contains the following evidence, summarized here: the 4,105 AK-47s for which AEY had received a Montenegro export license were delivered to AGW on 29 January 2008 (finding 11). The discrepancy report issued on 16 February 2008 noted that "most" of the crates "just look like a wooden box not wooden crate" and the "crates had no inside wooden partitions to separate the weapons from the accessories" and keep them in rows to make it easy to count (finding 12). CO Goff specifically asked that the warehouse personnel undertake an inventory to assess whether (1) the weapons were in good condition with "deficient" bracing, in which case they should be accepted; or (2) weapons were damaged, or crates were shipped without any bracing at all, in which case they should be "set aside." No such inventory appears in the record. (Finding 13) AEY arranged with SkyLink to pick up from the warehouse the crates that required repackaging, and when SkyLink did so, it was

36

informed by government personnel that only 130 crates needed attention (finding 14). These 130 crates were repackaged, delivered back to the warehouse, and accepted (*id.*).

After LTC McColumn, on 31 May 2008, authorized COL Cain at AGW to accept the M-0670 shipments, "including the AK-47s," Ms. Havemann at AGW inquired whether the authorization included the AK-47s that had not been re-packaged. CO Matson suggested that AGW not accept the AK-47s that had not been "reworked," because "[o]nce acceptance on these items has occurred, the contractor is no longer held liable." (Finding 50) Neither Ms. Havemann's inquiry nor CO Matson's response provided any evidence that the 2,805 rifles that had not been re-packaged were in any way nonconforming. Because only 130 crates of rifles were tendered to SkyLink as requiring work, and we have been presented with no evidence that the remaining 2,805 AK-47s were not in acceptable condition, we find the government's rejection of those rifles and CO Matson's subsequent termination for cause to be unsupported and improper. We hereby convert the termination for cause to a termination for convenience.

Finally, we hold that CO Matson's termination for cause of the 14,000 AK-47s to be sourced from Croatia under Contract M-0670 was improper. These items were not due under the contract until 19 May 2008. CO Matson issued a stop-work/do not ship order for the remaining items under this contract on 12 May 2008. Thus, AEY's delivery of the rifles from Croatia was prevented by an act of the government in its contractual capacity, making its failure to deliver excusable under FAR 52.212-4(f).

We have carefully considered all the arguments made by the parties. To the extent they are not mentioned herein, it is because they were not relevant to our disposition of the appeals or were not persuasive.

## CONCLUSION

The termination for cause of CLIN 0006AA (287 DShK machine guns) and partial termination of CLIN 0001 (one laser bore sight) of Contract M-0670 are upheld. In all other respects, the appeals are sustained, and the terminations for cause are converted to terminations for convenience. The matter is returned to the parties to negotiate a termination settlement.

Dated: 22 June 2018

LYNDA T. O'SULLIVAN
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

37

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 56470, 56471, 56472, 56473, 56591, Appeals of AEY, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

38